# AHMAD KESHAVARZ
*Attorney at Law*

---

16 COURT ST., 26TH FLOOR
BROOKLYN, NY 11241-1026

WWW.NEWYORKCONSUMERATTORNEY.COM
E-mail: ahmad@NewYorkConsumerAttorney.com

PHONE: (718) 522-7900
FAX: (877) 496-7809

January 28, 2019

**VIA ECF**
Magistrate Judge Steven M. Gold
United States District Court - Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:    Letter for reconsideration of Magistrate's Initial Conference Rulings and motion to compel discovery for Plaintiff's FDCPA and state law claims.

            *Luisa Calixto v. Balsamo & Rosenblatt, P.C.* et al, 1:18-cv-4675-MKB

Dear Judge Gold:

      The undersigned, along with CAMBA Legal Services, a non-profit legal services provider, represents Plaintiff Luisa Calixto in the above-captioned action against a debt collection law firm, Balsamo & Rosenblatt, P.C., and three attorneys at the firm, Robert Rosenblatt, Edward Hall, and Serenay Taysin (collectively the "Attorney Defendants") for violating the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, (the "FDCPA"), N.Y. Gen. Bus. Law § 349 *et seq.,* N.Y. Jud. § 487, and for committing negligence *per se* and gross negligence. Plaintiff also brings suit against putative landlords, 266 Realty NY LLC and Heung Sang Tam, and the managing agent Justice McAllister, (collectively, the "Landlord Defendants") for rent overcharge, for violating N.Y. Gen. Bus. Law § 349 *et seq.*, and for negligence *per se* and gross negligence.

## SUMMARY OF CLAIMS

      Ms. Calixto is a Spanish-speaking, low income, rent stabilized tenant who has lived in her apartment for more than 20 years. Over the years, her apartment and apartment building have had numerous repair issues that the Landlord has refused to fix, including a defective staircase that caused Ms. Calixto's developmentally disabled son to trip and break his wrist. In 2017, Ms. Calixto began to withhold rent in hopes of forcing the Landlord to make the necessary repairs. In total, Ms. Calixto withheld about $7,500, putting the rent in escrow each month. In response, the Landlord, through the Collection Attorneys, falsely claimed Ms. Calixto owed more than $30,000 and sued her for that amount, seeking eviction and a money judgment in New York City Housing Court. Promptly after receiving notice of the lawsuit, Ms. Calixto paid the money she was withholding and the Landlord gave her receipts that it earmarked showing she was up to date and did not owe any rent.

      Even though she did not owe any money and the Landlord gave her receipts showing she was up to date with her rent, the Landlord and the Collection Attorneys continued to vigorously

litigate the lawsuit against Ms. Calixto. On the first court date, Ms. Calixto appeared *pro se*, along with Mr. McAllister, the management agent for the property. Ms. Calixto presented her rent receipts to Mr. McAllister, who made copies of the receipts and said he would speak with the Landlord, though it is not clear why Mr. McAllister, the managing agent and the person sent to appear at the court date, could not confirm how much rent was owed. The case was then adjourned. In the meantime, Ms. Calixto retained a housing attorney from CAMBA Legal Services. Her attorney again presented proof to the Collections Attorneys that the money had already been paid to the Landlord. In spite of this, the Landlord and the Collection Attorneys pressed on with the lawsuit. Ms. Calixto then moved to dismiss. In response, The Collection Attorneys at first agreed to dismiss the case, but later, despite this representation, they served opposition and argued the motion, stating that this was done at the insistence of the Landlord. More than six months after the Landlord commenced the lawsuit, Ms. Calixto's motion to dismiss was granted and the action against her was dismissed.

Ms. Calixto's case was not a one-off occurrence; the Collection Attorneys and the Landlord Defendants regularly sue low income tenants such as Ms. Calixto for amounts they do not owe in an effort to force them out of their rent stabilized apartments. In fact, Ms. Calixto's attorneys have reviewed every proceeding brought by the Landlord Defendants for nonpayment of rent since 2016. The Collection Attorneys represented the Landlord Defendants in each case and in each case the Landlord Defendants sued for tens of thousands of dollars when no money or thousands of dollars less was actually owed. The details of the cases are striking in their similarity. In several instances, a suit is filed claiming tens of thousands of dollars are owed, but when the Landlord Defendants are put to their proof or the tenant puts up a fight, the case is discontinued without prejudice only to be filed again months later. Based on a review of the court files it appears that the Landlord Defendants and its Collection Attorneys are engaged in a broad illegal debt collection scheme to bring cases seeking inflated rental arrears as a means of harassing tenants and forcing them to leave their apartments. And this scheme appears to have been successful; in at least two instances tenants left their rent stabilized apartments rather than deal with another lawsuit. Based on this scheme, Ms. Calixto has asserted claims under the FDCPA, Gen. Bus. Law § 349 et seq., N.Y. Jud. § 487, and for committing negligence *per se* and gross negligence, and for rent overcharge.

A recent multi-part investigation by The New York Times highlighted these types of practices and found that large landlords in New York City exploit a broken regulatory system and overburdened housing courts in order to wrongly evict rent-regulated tenants or otherwise harass them into leaving their rent-regulated apartments. Kim Barker, Behind New York's Housing Crisis: Weakened Laws and Fragmented Regulation, N.Y. Times, May 20, 2018; Kim Barker, *et al.*, The Eviction Machine Churning Through New York City, N.Y. Times, May 20, 2018.[1] The Times reviewed thousands of pages of court records and building permits, examined in detail more than 1,000 housing court cases, and analyzed a database of more than one million housing court cases. *Id.* The Times found that because the state and city governments' diffuse regulatory system is unable to effectively oversee New York City's massive housing market, the system essentially relies on an honest marketplace, which large, corporate landlords, who control an increasing amount of the market share, exploit. *Id.* In addition, because New York City's overburdened housing courts are overrun with eviction suits, the Times found that landlords,

---

[1] Those articles are available, respectively, at https://www.nytimes.com/interactive/2018/05/20/nyregion/affordable-housing-nyc.html and https://www.nytimes.com/interactive/2018/05/20/nyregion/nyc-affordable-housing.html

who, unlike tenants, are almost always represented by an attorney, are using the court system as an "eviction machine," where their "errors often go uncaught and dubious allegations go unquestioned." The Eviction Machine, N.Y. Times, May 20, 2018. The investigation found that 232,000 cases were filed against tenants last year, which is approximately one case for every 10 rental units in New York City, often using "cookie-cutter" petitions that appeared not to have been reviewed by attorneys. *Id.* In many of the cases, tenants were sued for money they did not owe. *Id.* In essence, the Times investigation revealed that many landlords throughout the city have the same modus operandi – forcing rent-regulated tenants out of their homes via filing mass, often frivolous, lawsuits, and engaging in other forms of harassment, including illegal repairs that disturb the quiet enjoyment of rent-regulated tenants. *Id.* And, as discussed in more detail below, because Housing Court has limited jurisdiction, bad acts and practices that are discovered in the course of a Housing Court proceeding cannot be raised as affirmative claims before a Housing Court Judge.

## PROCEDURAL BACKGROUND

On December 17, 2018, Plaintiff and the Attorney Defendants had their initial conference before this Court. The Landlord Defendants had defaulted and did not attend. *See* DE 33 – 35 (certificates of default). Your Honor made a number of oral rulings based on an oral request by the Attorney Defendants. *See* **Exhibit A** (December 17, 2018 Initial Conference Transcript). Some of the oral rulings are summarized in the written order. *See* **Exhibit B** (DE 36, Initial Conference Written Rulings). The oral and written rulings are collectively the "Initial Conference Rulings."

At the hearing the Attorney Defendants indicated they were considering stipulating to liability under one provision of the FDCPA, 15 U.S.C. § 1692e, although no final decision had been made. The Attorney Defendants stated they would likely stipulate to the $1,000 maximum for FDCPA statutory damages.

Your Honor ruled that, due to the anticipated stipulation, you were limiting discovery to the subject of Plaintiff's actual damages for the FDCPA violations. Plaintiff was prohibited from doing discovery on the FDCPA violations (e.g. whether the Attorney Defendants intentionally violated the FDCPA) or from propounding any discovery regarding her state law claims. Your Honor expressed concerns that the state law claims against the Attorney Defendants should be litigated in state court, as should the claims against the defaulting Landlord Defendants.

Plaintiff's counsel objected, as the state law claims are within the Court's supplemental jurisdiction. Plaintiff noted that the Attorney Defendants were free to move to dismiss the state law claims if they disagreed, but absent such a motion, Plaintiff should be able to propound discovery to support the claims she pleaded in her Complaint because her FDCPA and state law claims are based on the same nucleus of operative facts. The jury trial as to Plaintiff's actual damages under the FDCPA will overlap with the actual damages from the state law claims.

Your Honor invited Plaintiff to file a letter brief to address your concerns and to seek to reconsider your rulings at the Initial Conference.[2] Further, Your Honor stated: "If plaintiff seeks

---

[2] Plaintiff understood the Magistrate's meaning of "reconsideration" in a colloquial sense as opposed to a formal Motion for Reconsideration pursuant to Local 6.3. For example, the Magistrate indicated that the reconsideration could be in in the form of a letter, while Local Rule 6.3 allows for a full motion. The Magistrate also indicated Plaintiff could file a letter at any time, while a Local Rule 6.3 motion must be filed within 14 days of the objected-to ruling.

3

to proceed with discovery on her state law claims, she may file a motion to compel that discovery that addresses the issues raised by the Court during the proceeding held today." In the interest of efficiency, we combine both of those postures in this letter motion.

Plaintiff submits this motion to request Your Honor's reconsideration of the Initial Conference Rulings. Plaintiff submits that (1) abstention is not at issue in this matter; (2) the Initial Conference Rulings incorrectly presupposed a lack of supplemental jurisdiction; (3) the stipulation to FDCPA liability does not eliminate the need for discovery beyond actual FDCPA damages, especially since Defendants dispute that they violated the FDCPA; and (4) whether there are actual damages, and the amount of such damages, cannot be assumed and must be determined at trial.

## ARGUMENT

### I. Abstention doctrine does not apply

Your Honor asked the undersigned to address the application of the abstention doctrine to the case at bar. *See* Exhibit A, Trans. 15:07-10 (As to the "pendent state law claims[…]why abstention isn't required and why[…]those claims won't inevitably be dismissed").

Abstention is "an extraordinary and narrow exception" to "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. U. S.*, 424 U.S. 800, 813, 817 (1976). *See also Woodford v. Cmty. Action Agency of Greene County, Inc.*, 239 F.3d 517, 522 (2d Cir. 2001). "Generally, as between state and federal courts, the rule is that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Colorado River*, 424 U.S. at 817, 96 S.Ct. 1236. Abstention is not warranted when there is no pending, concurrent litigation in the state court. "[T]he finality of proceedings at the state court level… categorically obviates the need for abstention." *Amerson v. Chase Home Fin. LLC*, No. 11-CV-01041-WJM-MEH, 2012 WL 1686168 (D. Colo. May 7, 2012). Here, the Housing Court case was dismissed on April 2, 2018, while the Complaint in this case was filed 4 months later, on August 17, 2018. Because the two actions were never concurrent, the abstention doctrine does not apply.

### II. Ms. Calixto's claims could not be brought in NYC Housing Court.

The Court suggested that the claims brought in the instant action should be brought in state court as it deals with federal and state law violations committed during the pendency of a state court lawsuit. *See Exhibit* A, Trans. 06:6-7, 17-19 ("There are pendent claims about the bad faith with which the state court litigation was conducted… Why isn't that an issue for the state court judge before whom those proceedings were held?"); Trans. 12:14-19 ("Well, it saves this court -- -- from adjudicating a case about the way a state court litigation was conduct which should be addressed by the state court. It's brought under state law.") and Trans. 13:03-04 ("You had the opportunity to seek punitive damages or some kind of a remedy from a judge who was hearing the issue and saw the conduct firsthand…").

However, the operation of Summary Proceedings in New York City Housing Court would not have allowed the claims in this federal lawsuit to be brought against the Landlord Defendants, and certainly not the Attorney Defendants, who were not parties in the state court lawsuit.

#### A. Summary proceedings in NYC Housing Court

4

New York City Housing Court is a specialized court with limited jurisdiction to deal with housing disputes. N.Y. Civ. Ct. § 110. The jurisdiction of the court is set out in the New York City Civil Court Act, and three types of actions dominate Housing Court practice: (1) nonpayment actions where the landlord seeks possession based on the nonpayment of rent; (2) holdover actions where a landlord seeks possession of the apartment for a reason that is not related to rental payments, such as nuisance behavior by a tenant, the landlord attempting to get possession of a rent stabilized apartment for its personal use, or the tenant staying after the expiration of a non-rent stabilized lease; and (3) Housing Part actions, cases where a tenant sues to have repairs done. The lawsuits against Ms. Calixto and the other tenants cited in the Complaint were all nonpayment proceedings filed in Housing Court in Kings County.

Nonpayment actions are special proceedings brought pursuant to Article 7 of New York Real Property Actions and Proceedings Law ("R.P.A.P.L.") and governed by the procedural and jurisdictional limitations set out in R.P.A.P.L. § 7 and C.P.L.R. § 400 et. seq. These limitations are significant; for example, nonpayment proceedings do not need to be served in accordance with C.P.L.R. § 308, discovery does not occur absent permission of the judge and that permission is only given in limited circumstances, cases move on an expedited schedule, the tenant must be in possession of the apartment, and the ability to assert counterclaims is limited and must be "inextricably intertwined" with the proceeding. R.P.A.P.L. §735; C.P.L.R. § 408; Warrin c. Haverty, 149 A.D. 564 (1912); *384 Hotel Corp. v. Café Comedy*, 6/4/92 N.Y.L.J. 24, col. 2 (Civ Ct. N.Y. County). In sum, nonpayment proceedings in Housing Court are concerned with and designed to quickly deal with questions of possession; they are not meant to be a forum for other issues between the landlord and the tenant.

To this end, the "inextricably intertwined" requirement is a strict one, only allowing for counterclaims to be asserted where a material element of the respondent's counterclaim is woven together with a material element of the petitioner's claim of possession, and even then, to such an extent that the court cannot unravel the two claims. In other words, the counterclaim and the claim for rent must significantly affect each other. *Id*. Examples of this are counterclaims based on the warranty of habitability.

The Housing Court is generally unwilling to entertain counterclaims sounding in negligence or tort because these claims are not inextricably intertwined with a claim for rent. *610 W. 142nd St. Owners Corp. v. Braxton*, 140 Misc.2d 826, 827, (App. Term, 1st Dept. 1988); *390 West End Associates v. Raiff*, 166 Misc. 2d 730 (App. Term 1st Dep't. 1995) ("To the extent that tenant also seeks damages traditionally within the scope of tort liability … those property damage claims are more appropriately tried outside the limited sphere of landlord-tenant proceedings.") The Housing Court has also been explicit in rejecting counterclaims with punitive and emotional distress damages components as too attenuated to the possessory claim. *Coronet Properties Co. v. Lederer*, N.Y.L.J., 2/21/86, p. 12, col. 2 (App. Term 1st Dep't.) (Counterclaim seeking $500,000 for 'mental distress and emotional anguish' attributable to legal proceedings "designed to intimidate and harass [tenant] into a surrender of her rent-controlled apartment" was severed since it did not "constitute a defense to the landlord's cause of action for rent. …").

### B. The Housing Court did not Have Jurisdiction to hear Ms. Calixto's State Law or Federal Claims.

During the hearing, the Court raised the issue of why the state law claims should not be heard in front of the state court judge in the Housing Court proceeding. As discussed above, the

5

Housing Court did not have jurisdiction to hear the majority of the claims in this case because they are not inextricably intertwined with the Landlord's claim for rent. *See 99 Realty Co. v. Wall Street Transcript Corp.*, 165 Misc.2d 454 (App. Term 1st Dep't. 1995). Ms. Calixto's allegations regarding the Landlord's fraudulent scheme are grounded in tort, encompassing far more than the Landlord's claim for rent against Ms. Calixto, and the Housing Court would not have had jurisdiction over them. *D&Z Holding Corp. v. Boulart*, 4/18/90 NYLJ 24 col. 6 (Civ. Ct. Kings County)(severing claims under GBL 349, the FDCPA, and common law, *inter alia*, because claims were not related to the landlord's claim for rent and the purpose of summary proceedings is the speedy inexpensive determination of landlord tenant controversies.).

The Housing Court would additionally not have had jurisdiction over the GBL 349 claim because that claim seeks injunctive relief, which the Housing Court does not have the ability to grant and would have resulted in her claim being severed. *Lozano v. Grunberg*, 195 AD2d 308 (App. Div. 1st Dep't. 1993). In addition, only one of the parties in this case was a party to the housing court proceeding – 266 Prospect Park West – and for the same reason that Ms. Calixto could not assert tort claims, she also could not bring in third parties to assert claims against them not related to the question of rent owed. Therefore, Ms. Calixto could not have brought any claims in Housing Court against the Attorney Defendants.

### III. The Stipulation To FDCPA Liability Does Not Eliminate The Need For Plaintiff's Discovery Beyond Her Own Actual FDCPA Damages

#### A. The Attorney Defendants' so-called "Stipulation" Letter does not specifically admit anything, and expressly denies certain allegations.

The Court asked why it mattered whether the Attorney Defendants violated 1692f or intentionally violated the FDCPA. *See* Exhibit A, Trans. 22:12-25:12. The answer is that different actual damages flow from different factual allegations and different resulting violations.

However in their January 3 so-called "Stipulation" Letter [DE 40] (the "Letter") and at the December 17 Initial Conference, the Attorney Defendants did not admit to any specific facts or any specific resulting FDCPA violations.[3] Indeed, the Attorney Defendants even now vaguely deny allegations in the Complaint. Defendants expressly "deny any intent to violate the FDCPA and/or engage in fraudulent or deceptive practices during the course of its representation of its client in the above referenced State court litigation." DE 40 p. 1, ¶ 2.

The sole admission in the Letter is that they will stipulate to "a" violation of 1692e. This does nothing to allow Ms. Calixto to testify as to her resulting actual damages. For example one 1692e claim is that the Attorney Defendants sent a collection letter for $30,000 when she only owed – if anything[4] -- approximately $7,500. Is that the apparently sole 1692e violation to which the Attorney Defendants are admitting?

---

[3] In addition, the Attorney Defendants did not admit to a single item in the Plaintiff's 122 paragraph Complaint. At the Initial Conference, the Attorney Defendants refused to amend its answer to specifically admit the allegations in the Complaint. *See* Exhibit A., Trans. 16:19-17:6, and the Court stated they were not required to do so. *Id.*, p.20:6-12.

[4] As explained in the Complaint, Ms. Calixto lawfully withheld rent payments because of the Landlord Defendants refusal to make even the most basic repairs to the apartment. DE 1, ¶¶ 23, 28. Ms. Calixto paid that amount promptly after being served. DE 1, ¶ 32-33. Despite this the Attorney Defendants and Landlord Defendants forced Ms. Calixto, then *pro se*, to appear in Housing Court. DE 1, P. 34.

6

But the garden variety emotional distress damages are far greater for the Attorney Defendants' violation of 1692f – a violation to which they do not admit. The Complaint alleges the Attorney Defendants engaged in "unfair or unconscionable" debt collection by continuing to vigorously litigate the collection and eviction suit after Ms. Calixto, *pro se*, produced at the initial hearing receipts documenting she owed no money. *See Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 138 (2d Cir. 2017) ("We hold that a debt collector engages in unfair or unconscionable litigation conduct in violation of section 1692f when, as alleged here, it in bad faith unduly prolongs legal proceedings or requires a consumer to appear at an unnecessary hearing.")

### B. If Defendants are allowed to testify at trial, Plaintiff must be allowed to engage in discovery to explore to what they may testify.

Further, the Court's Initial Conference Order, limiting the scope of questions Plaintiff may ask to those concerning her own actual FDCPA damages, was based on "assuming the [Defendants] agree that they're not going to testify at trial." See Exhibit A, Trans. 23:5-11. However, the Attorney Defendants have neither agreed not to testify at trial, nor did the Initial Conference Order expressly prohibit the Attorney Defendants from testifying. At trial Plaintiff will not know – and is prevented by the Initial Conference Order from learning in discovery – what the Attorney Defendants (and now the Landlord Defendants as well) will say on the stand.

### IV. The Initial Conference Rulings Incorrectly Presupposed Lack of Supplemental Jurisdiction

#### A. Discovery is not the proper venue for challenging supplemental jurisdiction; such determinations in this matter should be made pursuant to a motion to dismiss.

At the Initial Conference, Your Honor stated that under *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966), a federal court does not generally retain jurisdiction over state law claims once the federal claims are over. It was reasoned that, if the Attorney Defendants stipulated to liability under the FDCPA, then the federal claims would be extinguished, along with the federal question basis of the Court's original jurisdiction.

Discovery should be permitted "regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. Proc. 26(b)(1). District courts may decline to exercise supplemental jurisdiction over a claim under 28 U.S.C. § 1367(a) if: "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). If one of the provisions applies, the district court "should not decline to exercise supplemental jurisdiction unless it also determines that doing so would not promote the values articulated in *Gibbs*: economy, convenience, fairness, and comity." *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85 (2d Cir. 2018) *quoting Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004).

7

At the Initial Conference, Your Honor cited to *Gibbs* as a major source of concern.[5] Your Honor also considered at length the *Gibbs* values[6] that are considered once one of the four provisions of 28 U.S.C. § 1367(c) is determined to be applicable.

However, as Your Honor noted, this is a "discovery issue" rather than a determination of whether supplemental jurisdiction is present. Your Honor is vested with broad discretion as to determining the scope of discovery, and Plaintiff does not dispute this discretion. However, "a court does not ordinarily rule on the sufficiency of a claim or defense in a discovery context." *Solarex Corp. v. Arco Solar, Inc.*, 121 F.R.D. 163, 179 (EDNY 1988) *citing Chubb Integrated Systems Ltd. v. National Bank of Washington,* 103 F.R.D. 52, 59 (D.D.C. 1984). It is only where "the claim or defense appears baseless and the discovery would work a hardship on the answering party" that courts will rule on the sufficiency of a claim or defense. *Id.* In *Solarex*, the claim at issue was "facially deficient" and discovery was determined to be a fishing expedition. *Id.* Even so, the Court only denied discovery as to a single demand. *Id.* at 180. Here, all of Plaintiff's state law claims for which discovery has been prohibited are facially substantive. The decision to dismiss the claims must be made by the district court judge and is beyond the realm of a discovery proceeding. Because even if one of the provisions of 28 U.S.C. § 1367(a) is clearly fulfilled (though Plaintiff contends that none are), it is still the district court judge's discretion whether to deny supplemental jurisdiction based on the *Gibbs* values that Your Honor touched on.

Moreover, Plaintiff respectfully submits that any determination as to supplemental jurisdiction is at this point premature. *Chubb*, relied on by the Eastern District in *Solarex*, held that even when "couched in terms of relevance," challenges to the sufficiency of a claim are more appropriately dealt with in "a motion to strike" in the absence of a "patently insubstantial claim." *Chubb Integrated Systems Ltd. v. National Bank of Washington*, 103 F.R.D. at 59.

### B. Severing the state law claims would result in duplicative litigation and an additional burden on the courts and the parties.

Severing the state law claims would result in the same facts being discussed and litigated in two forums, both state and federal court. Allowing discovery on the state law claims in federal court would not pose a burden to the Attorney Defendants. Rather, if the state law claims are severed, discovery on the state law claims would simply proceed in state court. The Attorney Defendants would then face a more substantial burden in that they would have to proceed with discovery concerning the same nucleus of facts in two different forums.

### V. Whether There Are Actual Damages Cannot Be Assumed Or Separated From Liability For All The Claims, And Must Be Determined At Trial

---

[5] *See* Exhibit A, Transcript 09:01-08: "...let's assume that pendent jurisdiction would be properly asserted or supplemental, whatever they are calling it these days...would be properly asserted on those state law claims. If we look at *United Mineworkers v. Gibbs*, once the federal claim are over, we generally don't retain jurisdiction over the state law claims"; Id. at 09:17-20: "And therefore, under *Mineworkers v. Gibbs*, I will be dismissing or I suspect that Judge Brodie may be dismissing the pendent state law claims against the nonappearing parties..."; *Id*. at 26:14-20: "Once the FDCPA claims are litigated to judgment, which is what has to happen before we get to the default, they will be done and there won't be any federal question claims left in the case by the time we reach the defaulted defendants. So then Mineworkers is going to say dismiss and you're going to have to pursue them in state court."

[6] Transcript 15:17-23: "...as a matter of efficient allocation of judicial resources, [why] shouldn't [they] all be litigated in state court, which is the Court that presided over the case, even as a matter of comity..."

### A. An accurate determination of actual damages in this matter requires discovery on all the claims.

Actual damages in this case arise from Defendants' conduct as enumerated in the Complaint. These facts cannot be spliced for the purposes of only looking at actual damages under Defendants' stipulated FDCPA violation.

The claims asserted here involve the same nucleus of facts and, as a result, it is impossible to separate these facts in an effort to assess damages on a claim-by-claim basis. Defendants' continued prosecution of the collections case when they understood that they could not substantiate the value of the debt, and the emotional distress that resulted, necessarily implicates both 15 U.S.C. § 1692f *and* Judiciary Law § 487. Similarly, the damages from GBL § 349 and the FDCPA as to misrepresentations in the collections lawsuit and the 30-day notice necessarily overlap. And the emotional distress at issue cannot be identified as the result of a single stipulated FDCPA violation – the jury would need to consider the cumulative effect of Defendants' conduct, along with Plaintiff's testimony, to determine the value of the harm.

While the Court stated that the "concern really is less with the viability of the FDCPA claim than the jurisdiction over the pendent state law claims" (Trans. 08:09-11), the viability of the FDCPA claim is necessarily implicated in discovery on the state law claims, and vice versa. Plaintiff cannot present her case at a trial for damages without conducting fact discovery so as to explain to the jury what occurred.

### B. The facts alleged in the complaint supports a claim for potentially substantial actual FDCPA damages.

The underlying predicate of the argument of counsel for the Attorney Defendants is that Ms. Calixto's garden variety emotional distress damages under the FDCPA has little or no value. But Ms. Calixto may be entitled to a garden variety emotional distress award in the range of $30,000 to $125,000. In *Abel v. Town Sports Int'l, LLC*, 09 CIV. 10388 DF, 2012 WL 6720919 (S.D.N.Y. Dec. 18, 2012), the court summarized recent Second Circuit case law as to evidence sufficient to justify a "garden variety emotional distress" claim, noting that "the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury. Such claims typically lack [ ] extraordinary circumstances and are not supported by any medical corroboration." *Id*. at *15 (citations omitted). The court also provided an exhaustive review of garden variety emotional distress awards, noting the recent trend in these decisions to uphold awards between $30,000 and $125,000 for garden variety emotional distress. *Id.* at *16.

The possibility that Ms. Calixto may recover an emotional distress award in excess of $100,000 is consistent with FDCPA decisions and settlements obtained by the undersigned in recent years. In *Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP*, No. 15-CV-2741 JSR, 2015 WL 6437493 (S.D.N.Y. Oct. 21, 2015), the Court summarized the emotional distress damages claimed and the potential emotional distress award as follows: "Samms, who is elderly and disabled, asks for damages based on his emotional distress. He alleges he has become 'fixated on the collections lawsuit and suffered anxiety, including an inability to sleep for months at a time.' The Second Circuit has affirmed awards of over $100,000 for similar kinds of emotional distress. " *Samms* at * 2 *citing Lore v. City of Syracuse*, 670 F.3d 127, 177–78 (2d Cir.2012) (citations to complaint omitted). Similarly, the Court in *Gomez v. Resurgent Capital Servs., LP,* 129 F. Supp. 3d 147, 153–54 (S.D.N.Y. 2015), noted

9

that defendants did not cite any statute or case law establishing a cap on emotional distress awards. The case, which involved, *inter alia*, a threat of garnishment of 25 percent of wages based on a valid judgment, an amount greater than allowed under NY state law, and the garnishment of a few hundred dollars after the judgment was vacated, resulted in $222,500 in total settlements. Most recently, the undersigned obtained a $175,00 settlement in *Molgora v. Sharinn & Lipshie, P.C.* et al, 1:17-cv-03766 (SDNY), based solely on garden variety emotional distress due to the conduct of S&L, for which debt buyer CAG was vicariously liable.

Ms. Calixto can provide more than sufficient evidence of emotional distress to meet the *Abel* standard. As detailed in Plaintiff's Complaint, ¶ 80-86, the mental anguish and stress Ms. Calixto experienced as a result of Defendants' actions lasted the duration of her housing court case and continued even after the case ended. She was extremely stressed by the fact that Defendants' were seeking to collect $31,175.00, an amount significantly more than she ever owed, and she worried constantly that she and her children would be evicted and left homeless. This fear of being forced out of her home led her to suffer from severe sleeping problems. She would lie awake, wondering where her and her children would go if they had to leave. She cried frequently and her stress and fear impacted her children, who were scared and worried about how they would get to school if they had to live in a shelter.

Mr. Novikoff, counsel for the Attorney Defendants, knows full well the potential value of garden variety emotional distress claims. Upon the filing of an answer, he has settled with my office for $60,000 in a case that involved sending a garnishment notice for a vacated judgment . The majority of that settlement amount was for garden variety emotional distress damages.

What a jury would actually award Ms. Calixto for her garden variety distress is obviously unknown. But discovery should not be curtailed based on an assumption that the garden variety damages the Attorney Defendants inflicted has no value.

## VI. The Subsequent Appearance of the Landlord Defendants Further Strengthens Plaintiff's Position.

Lastly, Your Honor previously held that the abstention argument "comes even more clearly into play and particularly if we end up with default judgments, as it looks like we well might against some defendants who are only named in state court claims and not even parties to a federal cause of action." *See* **Exhibit A**, Trans. 08:12-16. That argument is mooted by the appearance of the Landlord Defendants. There will no longer be a bifurcation of the litigation against the Attorney Defendants and Landlord Defendants – both can proceed simultaneously and the concern of this Court that "there will be no federal claims left to adjudicate" (*Id*. Trans. 09:13-14) will no longer be the unavoidable outcome. Of course, this issue could be revived by motions to dismiss by either set of Defendants, but that has always been Plaintiff's proposed procedural course. *See Id*. Trans. 14:07-08 ("We have claims. They can move to dismiss them.")."

## VII. Conclusion.

For these reasons, and in light of the Landlord Defendants' recent appearance, Plaintiff respectfully requests that the Court vacate its prior order limiting the scope of Plaintiff's discovery requests to her actual FDCPA damages. Further, Plaintiffs seeks a new scheduling order. Counsel for Plaintiff and for the Attorney Defendants had agreed to a proposed joint

scheduling order during the Fed.R.Civ.P. 26(f) telephone conference, as well as to other discovery items.

      We thank the Court for its consideration.

Respectfully,

/s/

Ahmad Keshavarz

One of Plaintiff's Attorneys

Enclosures:
      Exhibit A, Transcript of Initial Conference, December 17, 2018.
      Exhibit B, Initial Conference Written Rulings, DE 36, December 17, 2018.

cc:    All attorneys of record via ECF